596 S.E.2d 494

**In the Matter of William Jefferson McMILLIAN, III, Respondent.**

**No. 25822.**

Supreme Court of South Carolina.

Submitted April 13, 2004.
Decided May 17, 2004.
Rehearing Denied June 9, 2004.

Henry B. Richardson, Jr., Disciplinary Counsel, of Columbia, for the Office of Disciplinary Counsel.

R. Davis Howser, of Columbia, for respondent.

PER CURIAM:

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an

Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the agreement, respondent admits misconduct and consents to the sanction of disbarment. We accept the agreement and disbar respondent from the practice of law in this state. The facts, as set forth in the agreement, are as follows.

## FACTS

### I.

Respondent was admitted to practice law in November 2000. Around March 2001, respondent entered into a business arrangement with Carolina Title Services, Inc., (CTS) through its principal officer and manager Amy Cook (Cook). The purpose of the arrangement was to close large volumes of real estate loans. Neither Cook nor any other CTS employees were licensed to practice law.

Under respondent and CTS' arrangement, real estate loan transactions would be closed, for the most part, in the following fashion: the handling of the underlying transactions were solicited and obtained by CTS; the lenders sent the loan packages directly to CTS; CTS' non-lawyer staff would conduct or obtain a title search which was completed by a non-lawyer; the non-lawyer staff of CTS would prepare the closing documents; respondent attended closings, reviewed closing documents with parties and signed HUD–1 Settlement Statements as "settlement agent;" thereafter, CTS would see to the recordation of the documents, the disbursement of the proceeds of each transaction, the issuance of title insurance policies, and other actions necessary to consummate the transactions.

For attending the closings, respondent was usually paid a fee of $300 to $350 out of each transaction which was reflected on the Settlement Statements. CTS retained amounts collected for title examination, document preparation, title insurance commitment/binder fees, and commissions on title insurance premiums.

To implement the foregoing arrangement, respondent opened an IOLTA Trust Account at Bank A. This account was styled "The McMillian Law Firm Trust Account." Respon-

dent gave Cook signatory authority over this trust account. The trust account checkbooks, bank statements, and cancelled checks were maintained by Cook at the offices of CTS. CTS' address was used for mailing monthly bank statements and cancelled checks. Deposits to and disbursements from this account were usually made by Cook and/or employees of CTS without respondent's supervision.

Cook was a licensed agent for Chicago Title Insurance Company (Chicago Title) which was the primary provider of title insurance for the transactions closed in furtherance of the foregoing arrangement and, in most cases, Chicago Title issued insured closing letters in connection with these transactions. Usually, loan packages were sent directly from lenders to CTS and almost all negotiations and discussions with lenders related to these transactions were handled by the staff of CTS and not respondent.

Under this arrangement, approximately three hundred transactions were closed by CTS with respondent's assistance and/or using one of respondent's trust accounts between March or April 2001 and April 2002. Respondent estimates that he was present at 80% to 95% of the closings, however, because of the large volume of transactions, it was impossible for him to attend all the closings. When respondent did not attend, closings were conducted by CTS' non-lawyer staff without the presence of a licensed attorney. In those cases, someone at CTS would sign respondent's name to the HUD–1 Settlement Statements and any other documents requiring respondent's signature. While respondent never specifically authorized anyone else to sign his name on documents, on a few occasions, respondent had actual knowledge that Cook and/or one or more employees at CTS were signing his name to closing documents and had constructive knowledge that this was occurring on the other occasions when respondent was unable to be present at closings. Notwithstanding this knowledge, respondent did not prohibit Cook or other CTS employees from signing his name to closing documents and, by not doing so, gave his tacit approval to this practice.

During the entire period of the foregoing arrangement with CTS, respondent maintained no files concerning the real estate transactions (other than a list of closings for which he

expected payment from CTS), failed to reconcile or even review monthly bank statements, and failed to comply with any of the money handling and record keeping requirements of Rule 417, SCACR, notwithstanding establishment of an IOLTA Trust Account styled "Law Offices of William J. McMillian, III, Trust Account." Contrary to Rule 417, SCACR, no one involved in these transactions maintained ledgers or placed identifying data on checks and deposit slips. Any files maintained on these closings were kept by CTS at its offices.

Under this arrangement, neither clients nor lenders (for the most part) were advised of respondent's limited role in the closing of these real estate transactions through CTS. Because respondent provided limited services to clients in these closings, the fees charged for his services were excessive. By signing the HUD–1 Settlement Statements as "settlement agent," respondent gave the parties and lenders the incorrect impression that he had or was going to see to the proper disposition of the settlement proceeds when, in fact, he did not do so. Respondent's actions were contrary to the certification requirements imposed by the Federal Truth in Lending Act.

Beginning in September 2001, respondent became aware of non-sufficient fund (NSF) charges for checks written on the Bank A trust account. In November 2001, respondent became aware that there was a negative balance of approximately $119,000 in the Bank A trust account. In this time frame, respondent learned that one or more lenders would no longer accept checks written on this account because of the NSF problems.

As a result of checks on the Bank A trust account not being accepted and because of negative balances in the account, respondent opened a new trust account styled "McMillian Law Firm, P.A., IOLTA Trust Account" at Bank B in December 2001. Notwithstanding the difficulties experienced and the irregularities reported in the Bank A trust account managed by Cook, respondent allowed Cook to be a signatory on the Bank B trust account and continued to allow Cook to make deposits to and write checks from both his Bank A and Bank B trust accounts in furtherance of closing real estate transactions pursuant to his arrangement with CTS.

After opening the Bank B trust account, respondent became aware that Cook was "floating" funds between the Bank A and Bank B trust accounts. Presumably, the "float" was necessary in order for checks to clear in spite of shortages in the accounts.

In December 2001 and January 2002, respondent unsuccessfully attempted to work with Cook to identify the nature and amounts of the bank account shortages and then correct the shortages. On or about February 5, 2002, respondent had his last direct dealings with Cook. After that occasion, respondent appeared at the closing of one or two more loans for CTS. Respondent ceased attending closings for CTS in late March 2002.

After respondent ceased, for the most part, attending closings of transactions with CTS in January 2002, Cook made arrangements with several other attorneys to attend closings on behalf of CTS in place of respondent. Even after respondent terminated his working relationship with CTS, respondent continued to allow Cook to be a signatory on and have control and use of both the trust accounts until respondent was placed on interim suspension on May 1, 2002.

ODC's examination of the Bank A trust account revealed that this account was assessed charges for overdrafts and/or NSF checks on approximately 309 occasions, had a negative balance on approximately sixteen occasions, had a negative balance of $372.98 on April 30, 2002, and had shortages of approximately $188,000 when the attorney to protect clients' interests took charge of that account. ODC's examination of the Bank B trust account indicated overdrafts and/or NSF checks on thirty-four occasions and a shortage of $250,000 on April 30, 2002.

Respondent learned of the approximately $119,000 shortage in the Bank A trust account in November 2001, the approximately $188,000 shortage in the Bank A trust account in February 2002, and the approximately $250,000 shortage in the Bank B trust account in January 2002. Respondent took no action to either close the accounts or to remove Cook as signatory on the accounts. Cook continued to have the use of and control over both of the trust accounts until they were

placed under control of an attorney to protect clients' interests by this Court.

Unbeknownst to respondent, Cook directed that Bank A place a "sweep" order on the Bank A trust account in March 2002. Pursuant to this order, funds in the account were "swept" out of that account on a daily basis and into Cook's personal account or into some other account under her control.

Chicago Title reported that, in compliance with the terms of its title insurance policies and/or its insured closing letters, it had paid out approximately $714,214 due to shortages in respondent's trust accounts and had further paid out approximately $36,000 in negligence claims in connection with transactions closed by CTS. In addition, Chicago Title has, in the aggregate, spent approximately $868,000 due to claims and expenses related to CTS (not all of these claims relating to closings attended by respondent, but most being related to the use of respondent's trust account by CTS) and that approximately sixty claims are still pending against Chicago Title arising out of transactions which were closed or were supposed to have been closed by CTS.

On July 20, 2001, respondent used a counter check to withdraw $4,140 for his own personal use out of the Bank A trust account. Respondent represents that this check was reimbursement for a personal check he wrote to facilitate a closing where CTS had depleted the printed checks on the Bank A trust account. A personal check from respondent's personal checking account in the amount of $1,765 was deposited into the Bank A trust account in the relevant time frame. Respondent explains the balance of $2,375 was for unpaid fees and/or other amounts due respondent in connection with closings. Respondent cannot now document this representation.

On September 19, 2001, using a counter check, respondent wrote a check on his Bank A trust account for his own personal use in the amount of $46,666.87. Respondent represents this check was written to repay himself for an advance he had made from his personal checking account to conclude a transaction being handled by CTS. There was, in fact, a check written on respondent's personal account deposited to the Bank A trust account on that occasion in the amount of $45,916.87. Respondent represents the difference of $750 was

58

for fees owed to him in connection with that transaction. Respondent cannot now document this representation.

In December 2001, respondent used a counter check to withdraw $1,504 from the Bank A trust account for his own personal use. Respondent represents that this withdrawal was made because CTS had depleted the escrow checks, that respondent had written a personal check to conclude a closing, and that the check was reimbursement for that advance on respondent's personal checking account. No check in that exact amount was located in respondent's personal checking account in the relevant time frame.

On January 7, 2002, respondent withdrew $2,000 from the Bank A trust account and on January 25, 2002, withdrew an additional $2,105 from that trust account using either counter checks or withdrawal slips. These withdrawals were for respondent's own personal use and benefit. Respondent represents these amounts were in payment of fees due him for attending closings for which CTS failed and refused to pay him. Respondent cannot now document this representation.

Respondent represents he maintained a list of fees due from CTS on which he relied in making these withdrawals to himself out of the Bank A trust account. Respondent advises that the list on which he relied cannot be located.

None of the above-mentioned checks or withdrawals by respondent from the Bank A trust account had any notations indicating the files or clients to which they related. Respondent now recognizes that, because of shortages in the Bank A trust account, the money he withdrew in January 2002 for fees due from CTS were, in all likelihood, taken from the proceeds of unrelated transactions.

Subsequent to respondent's interim suspension, it became apparent that there had been substantial misappropriations from both the Bank A and Bank B trust accounts. ODC does not contend respondent misappropriated any money from these accounts and does not contend respondent was *directly* responsible for the shortages in these accounts other than respondent allowing others to have control over the trust accounts, his failure to manage, supervise, and reconcile the trust accounts, and respondent's withdrawals for fees due in January 2002. ODC does not allege respondent misappropri-

ated any of the missing money, except for concerns relative to payment of fees by respondent directly to himself which (assuming these fees were in fact due) were likely paid out of proceeds of unrelated transactions due to shortages in the trust accounts known to respondent on the occasion he paid himself the fees. While it appears the foregoing shortages were the result of misappropriation on the part of someone, ODC does not allege respondent was involved in, had actual knowledge of, or condoned any intentional misappropriation out of the two trust accounts.

## II.

In this matter, respondent served as the closing attorney for the buyer in an August 2001 real estate transaction. After the buyer failed to receive a deed to the land and the title to the mobile home as contemplated by the transaction, litigation ensued. The complainant in this matter is an attorney who defended the lender.

As the underlying litigation progressed, it was learned that the deed had not been witnessed, probated, or recorded, and that the loan proceeds from the lender had been received into and disbursed out of respondent's trust account, but the mortgage to the lender had never been prepared or signed by the borrower. When the lender inquired, the lender was furnished with a bogus mortgage containing a forged signature and a falsified date/time stamp indicating recordation of the mortgage. The borrower defaulted on the obligation, raising forgery of the alleged mortgage and failure to receive title to the real estate or mobile home as a defense to the lender's claim. As a result, the lender is now the holder of an unsecured note.

While respondent denies any involvement in the falsification of the mortgage, he acknowledges he failed to properly review the closing documents, failed to notice and/or take action to rectify the fact that there was no mortgage in the closing package and the deed was unsigned, and he allowed CTS to disburse the proceeds of that transaction using his trust account without his supervision. Although respondent's only involvement in the transaction was to be present and superintend the execution of the documents, in doing so he failed to

supervise the CTS non-lawyer staff and failed to oversee the disbursements of the proceeds of the transaction in accordance with the closing documents, thereby assisting CTS and/or Cook in the unauthorized practice of law.

### III.

In this matter, a bank branch manager filed complaints concerning two NSF checks drawn on respondent's trust account and bearing the signature "Amy Cook." Both of these checks are dated March 26, 2003; one is in the amount of $76,220.40 and the other is in the amount of $65,282.48. It is noted this bank branch had honored Cook's directions to "sweep" this account even though it was an IOLTA account in the name of the McMillian Law Firm.

### IV.

In this matter, the complainant reports a loan was approved for its customer and closed by CTS in April 2002. Complainant received a check drawn on respondent's trust account and bearing the signature of "Amy Cook." Complainant was later notified by its bank that the "funds were uncollected." In connection with the same matter, the customer did not receive the mobile home she sought to purchase. Respondent was not involved in the underlying transaction, except that, by allowing CTS to use his trust account in the underlying closing, respondent assisted CTS' non-lawyer staff in the unauthorized practice of law.

### V.

In this matter, the complainant reports a check drawn on respondent's trust account and bearing the signature "Amy Cook" was dishonored upon presentment. Respondent was not involved in the underlying transaction, except that, by allowing CTS to use his trust account in the underlying closing, respondent assisted CTS' non-lawyer staff in the unauthorized practice of law.

### VI.

In this matter, the complainant is an attorney whose clients had either closed or had sought to close refinancing transac-

tions with CTS in early 2002. Necessary transactions were not completed and it took one year and the assistance of new counsel to close on the refinancings. Respondent was not involved in the underlying transactions except that, by allowing CTS to use his trust account in the underlying closing, respondent assisted CTS' non-lawyer staff in the unauthorized practice of law.

## *VII.*

The complainant in this matter sought to purchase a lot and mobile home through a real estate transaction handled by CTS. The closing was attended by an attorney who was hired by CTS (not respondent). This attorney did not otherwise participate in this transaction. Various problems arose and the attorney refused to assist the complainant in rectifying the situation. After the complainant hired another attorney, the impediments to the closing were rectified. Respondent was not involved in the underlying transactions except that, by allowing CTS to use his trust account in the underlying closing, respondent assisted CTS' non-lawyer staff in the unauthorized practice of law.

## *VIII.*

In this matter, the complainant closed a real estate transaction through CTS. The closing was attended by an attorney who was hired by CTS (not respondent). Subsequent to the closing, the complainant's homeowner's insurance policy was cancelled because the check for the premium had "bounced." The check had been written on respondent's trust account. Other discrepancies concerning the closing were later identified. Respondent was not involved in the underlying transactions except that, by allowing CTS to use his trust account in the underlying closing, respondent assisted CTS' non-lawyer staff in the unauthorized practice of law.

## *IX.*

After he was placed on interim suspension, respondent applied for a position as a receptionist/legal secretary with a law firm. He deleted the fact that he had graduated from law school from his resume. Respondent did not disclose that he

was an attorney or that he was under interim suspension. After ODC advised him that employment with the law firm would violate Rule 34, RLDE, respondent withdrew his application.

Respondent states he now recognizes that the Rules for Lawyer Disciplinary Enforcement prohibit a lawyer from attempting to violate the professional rules. He further recognizes that Rule 34, RLDE, prohibits a suspended lawyer from being employed by a member of the South Carolina Bar as a paralegal or in any other capacity connected with the law.

### *Cooperation with Disciplinary Counsel*

ODC states that, under best information and belief, respondent has fully cooperated with its inquires. ODC further states respondent has not been previously sanctioned nor found to have committed professional misconduct.

## *LAW*

Respondent admits that by his misconduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.2(c) (lawyer may limit the objectives of the representation if the client consents after consultation); Rule 1.5(a) (lawyer's fee shall be reasonable); Rule 1.15(a) (lawyer shall hold property of clients in the lawyer's possession in connection with a representation separate from the lawyer's own property); Rule 5.3(a) (a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that a non-lawyer employee or associate's conduct is compatible with the professional obligations of the lawyer); Rule 5.3(b) (lawyer having direct supervisory authority over a non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer); Rule 5.3(c) (lawyer shall be responsible for conduct of a non-lawyer that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if either the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved or the lawyer is a partner in the law firm in which the non-lawyer is employed, or has direct supervisory

authority over the non-lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take remedial action); Rule 5.4(a) (a lawyer or law firm shall not share legal fees with a non-lawyer); Rule 5.4(b) (lawyer shall not form a partnership with a non-lawyer if any of the activities of the partnership constitute the practice of law); Rule 5.5(b) (lawyer shall not assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law); Rule 8.4(a) (it is professional misconduct for a lawyer to violate the Rules of Professional Conduct); Rule 8.4(d) (it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); and Rule 8.4(e) (it is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice). In addition, respondent admits his misconduct constitutes a willful violation of Rule 417, SCACR. Finally, respondent admits he violated Rule 7 of Rule 413, RLDE, by attempting to gain employment as a paralegal during his interim suspension. *See* Rule 34, RLDE.

## *CONCLUSION*

We accept the Agreement for Discipline by Consent and disbar respondent. Respondent's request that the disbarment be made retroactive to the date he was placed on interim suspension is denied.

Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.