623 S.E.2d 652

**In the Matter of Sabine S. BOULWARE, Respondent.**

**No. 26082.**

Supreme Court of South Carolina.

Submitted Oct. 25, 2005.

Decided Dec. 19, 2005.

Henry B. Richardson, Jr., Disciplinary Counsel, and Michael J. Virzi, Assistant Disciplinary Counsel, both of Columbia, for Office of Disciplinary Counsel.

J. Steedley Bogan, of Columbia, for respondent.

PER CURIAM.

The Office of Disciplinary Counsel (ODC) and respondent have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR, in which respondent admits misconduct and agrees to imposition of an admonition, public reprimand, or definite suspension not to exceed thirty (30) days. We accept the agreement and issue a public reprimand. The facts, as set forth in the agreement, are as follows.

## FACTS

In February 2002, respondent approached Amy Cook, the principal of Carolina Title Services, Inc., (CTS) in hopes of obtaining some of its real estate business.[1] CTS was an agent for Chicago Title Insurance Company (Chicago Title) and had an ongoing business relationship with attorney William J. McMillian, III, for the closing of real estate transactions. Respondent sought to be a closing attorney for CTS, but Cook only needed a lawyer to fill in for McMillian at closings when he was unavailable. After seeking and obtaining Chicago Title's approval and speaking with McMillian by telephone, respondent agreed to the arrangement.

Respondent represents that, during her telephone conversation with McMillian, he assured her that, other than attending the actual closing, he would be supervising all aspects of the transactions.[2] Respondent never met McMillian and did not communicate with him again until after terminating her relationship with CTS.

---

**1.** Respondent was admitted to the Bar in November 1999. At the time she contacted Cook, respondent had recently opened her own office and was seeking to build her practice.

**2.** McMillian's statements to ODC contradict respondent's representation.

From February through April 2002, respondent attended approximately twenty-four real estate closings. Respondent was asked only to attend the closings and be responsible for the review and execution of the closing documents. Respondent represents she was under the good faith impression that McMillian would attend to or supervise all other aspects of the real estate transactions; however, McMillian did not do so and it is now known that he took no part in these transactions.

The closings took place at CTS' offices. Respondent received all files and instructions from Cook or her employees and, after the closing, she left all closing documents and monies with Cook or her employees. Most of the closings at issue were relatively uncomplicated. On the few occasions when a question or problem arose, respondent stopped the closing and Cook rescheduled it for a later date. Respondent is now advised and does not dispute that the title abstracts and closing documents were prepared by Cook and CTS employees without the supervision of any lawyer, that disbursement of funds and recordation of documents were handled by Cook and CTS employees without the supervision of any lawyer, and that McMillian's only involvement in the transactions consisted of allowing Cook unlimited and unsupervised use of his trust accounts.[3]

Respondent represents she verbally informed the parties to each closing that her role was limited to explaining and executing the documents and that CTS and its lawyer were responsible for all other aspects of the closing. However, on several occasions, respondent supervised the buyer's execution of an attorney preference form during which buyers selected respondent to represent them in all aspects of the transaction.[4] On these occasions, respondent filled in her own name as the selected attorney on the form prior to its execution by the buyer.

On thirteen occasions, the HUD–1 Settlement Statements included a $12 wire fee payable to respondent even though respondent never incurred a wire fee in any transaction with CTS. ODC is informed and believes that, in each of these

---

**3.** *See In the Matter of McMillian,* 359 S.C. 52, 596 S.E.2d 494 (2004).

**4.** *See* S.C.Code Ann. § 37–10–102 (2002).

closings, a wire fee was incurred by CTS or McMillian's trust account under Cook's control. Because respondent had requested Cook increase her fee, Cook offered to give respondent the $12 wire fee as a way to increase her fee without turning away clients who might object to an overt fee increase. Respondent consented to this arrangement. Respondent now recognizes that the HUD–1 statement was not completely accurate and that the arrangement resulted in respondent receiving a portion of her fee from someone other than her client.

On one occasion, respondent closed a transaction in which the buyers were personal friends of Cook. Cook had agreed not to charge the buyers an attorney fee and the HUD–1 Settlement Statement reflected no fee to any lawyer. However, Cook and respondent agreed that Cook would pay respondent a fee outside the closing and not disclose the fee to anyone. Respondent now recognizes that closing the transaction in this manner and accepting an undisclosed fee violated the Rules of Professional Conduct and federal law.

In most of the transactions respondent closed, respondent's name or her firm name were shown on the HUD–1 as "Settlement Agent," but respondent did not act as settlement agent as she neither held nor disbursed the closing proceeds. Due to her inexperience, respondent was not aware of all the implications made by the statements on the HUD–1 form. Respondent now recognizes that, by forwarding inaccurate HUD–1 forms to clients and other parties, she misrepresented her role to all parties relying on the HUD–1 Settlement Statements, particularly lenders who were not present at the closings. Her misrepresentation is most pronounced in those closings in which the HUD–1 Settlement Statements indicated that respondent incurred a wire fee, as the statements implied to lenders and subsequent assignees that respondent was disbursing the loan proceeds, including making payoffs of prior mortgages and liens.

On two occasions, a lender delivered closing funds to respondent's trust account rather than to McMillian's trust account for transactions in which respondent was to act as closing attorney for CTS. Respondent endorsed the first check to CTS based on information from Cook that the lender

wanted Cook to disburse the money. The second check was a wire transfer into respondent's trust account which respondent initially refused to endorse to Cook but, when a CTS employee refused to give respondent a disbursement summary, respondent relented and wrote a trust account check to CTS for the funds so that the transaction could close without the borrower losing a favorable interest rate.

On one occasion, a buyer brought funds to the closing in the form of a check payable to respondent. Due to a title issue, the closing was delayed until a time when respondent would not be available. As a result, respondent endorsed the buyer's check to CTS and gave it to Cook. Respondent now recognizes she should not have given the client funds to a non-lawyer.

On two occasions, respondent signed a loan confirmation or "First Lien Letter" several days after closing. These letters advised the lender and title insurance company that the transaction was closed and completely disbursed, that all prior liens were satisfied, and that the lender's mortgage was a valid first lien on the property. Respondent represents she believed those statements were true but admits that such a belief was merely an assumption, that she had no actual knowledge of the truth or falsity of the statements, and that she did not verify the information with anyone outside of CTS before executing the letters.

It is now known that in most, if not all, of the transactions closed by respondent for CTS, Cook diverted closing proceeds from McMillian's trust accounts to her personal accounts and did not disburse money to the parties as indicated on the HUD–1 Settlement Statements. Respondent had no knowledge of this activity at the time.

Since 2002, Chicago Title and its counsel have worked to correct the title problems caused by Cook's defalcation in transactions involving respondent and other lawyers. Chicago Title has spent approximately $250,000 to resolve title issues in closings in which respondent was involved. In addition, several holders of unpaid prior mortgages compromised their debts in settling with Chicago Title and, therefore, remain financially prejudiced; Chicago Title denied coverage in several other cases, leaving the holders of those unpaid prior liens and mortgages with no recourse but foreclosure. Respondent

has resolved through settlement each lawsuit in which she was a named defendant.

In addition to the transactions in which respondent served as closing attorney, on numerous occasions respondent received checks written on McMillian's trust account and signed by Cook as payment of attorney fees for closing in which respondent had no involvement. In at least three of these transactions, Cook had used respondent's name as the settlement agent on closing documents but, as with other transactions, Cook had stolen the lender's money and did not make the disbursements as indicated in the HUD–1 Settlement Statements. Respondent had no knowledge of these transactions or of Cook's defalcations until being so advised by ODC. Nevertheless, respondent and her staff deposited these fee checks into respondent's operating account, incorrectly assuming that they related to transactions in which she had served as closing attorney. Respondent maintained no office procedure for matching incoming payments to closing work performed and, therefore, unwittingly received payments for the use of her name and law license by a non-lawyer.

On three occasions in March 2002, a lender wired closing funds totaling $197, 285.99 to respondent's trust account. Respondent closed two of those transactions, not knowing funds were wired to her account, but assuming they were wired to McMillian's account as usual. Cook closed the third transaction without respondent's knowledge. In all three of the transactions, the funds were not disbursed as indicated in the HUD–1 Settlement Statements. Respondent attempted to reconcile her trust account on a monthly basis, but her reconciliations did not alert her to the excess funds in her trust account.

Several months after respondent terminated her relationship with CTS she sought an agency relationship with Stewart Title Company pursuant to which Stewart Title conducted an audit of respondent's trust account. The audit alerted respondent to the excess funds in July 2002 and respondent immediately took steps that resulted in delivery of those funds to the appropriate parties. Until the audit, respondent had no knowledge of the three wires into her trust account. Respondent now recognizes that, in order to comply with Rule 417,

SCACR, on a monthly basis she must reconcile the trust account balance according to the bank's records with the balance according to her records of account activity and that, if she had complied with Rule 417, she would have been immediately alerted to the improper deposits.

After closing approximately two dozen transactions between February and April 2002, respondent became aware that Cook or a CTS employee had forged her name on a HUD–1 Settlement Statement and on a closing proceeds check from a lender and that checks written by CTS were being dishonored for insufficient funds. Upon learning this information, respondent severed her relationship with CTS. Respondent then sent a letter to the Commission on Lawyer Conduct (Commission) purporting to be an anonymous report of Cook's and McMillian's actions. The letter sought the advice of the Commission and offered respondent's assistance in stopping the ongoing defalcation.

In mitigation, respondent states she was under the good faith impression that McMillian was performing or supervising all aspects of the real estate transaction that required attorney participation. She further states she was unaware that Cook was engaged in the unauthorized practice of law, that she was unaware that Cook had unsupervised access to and use of McMillian's trust accounts, and that she in no way intentionally contributed to the defalcations in these transactions.

## *LAW*

Respondent admits that, by her misconduct, she has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation); Rule 1.4(b) (lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation); Rule 1.8(f) (lawyer shall not accept compensation for representing a client from one other than the client unless the client consents after consultation); Rule 1.15 (lawyer shall safe keep client funds); Rule 4.1(a) (in course of representing a client, lawyer shall not make a false statement of material fact to a third person); Rule 5.5(b) (lawyer shall not assist a person in the unauthorized practice of law); Rule 8.4(a) (it is

professional misconduct for lawyer to violate Rules of Professional Conduct); and Rule 8.4(d) (it is professional misconduct for lawyer to engage in dishonesty, fraud, deceit, or misrepresentation).[5] Respondent acknowledges that her misconduct constitutes grounds for discipline under the Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR, specifically Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct).

## CONCLUSION

We find that respondent's misconduct warrants a public reprimand. Accordingly, we accept the Agreement for Discipline by Consent and publicly reprimand respondent for her misconduct.

**PUBLIC REPRIMAND.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur. WALLER, J., not participating.

---

**5.** Respondent's misconduct occurred before the effective date of the Amendments to the Rules of Professional Conduct. *See* Court Order dated June 20, 2005. The Rules cited in this opinion are those which were in effect at the time of respondent's misconduct.